UNITED STATES of America, Appellee,

v.

Louis GRESKO, Appellant.

UNITED STATES of America, Appellee,

v.

Emilio R. "Hambone" JULIAN,
Appellant.

UNITED STATES of America, Appellee,

v.

John C. BERARDINELLI, Appellant.

Nos. 79-5186 to 79-5188.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1980.

Decided Oct. 2, 1980.

Stanley W. Greenfield, Pittsburgh, Pa. (John W. Murtagh, Jr., Pittsburgh, Pa., on brief), for appellants, Julian and Berardinelli.

Barbara Fleisher, Charleston, W. Va. (Stanley E. Preiser, Frederick D. Fahrenz, Preiser & Wilson, Legal Corporation, Charleston, W. Va., on brief), for appellant, Gresko.

William A. Kolibash, Asst. U. S. Atty., Wheeling, W. Va. (Stephen G. Jory, U. S. Atty., Elkins, W. Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, HARRY PHILLIPS, Senior United States Circuit Judge, Sixth Circuit, sitting by designation and J. DICKSON PHILLIPS, Circuit Judge.

Harry PHILLIPS, Senior Circuit Judge.

The appellants were convicted of operating illegal gambling businesses in violation of 18 U.S.C. § 1955 and of conspiring to obstruct local law enforcement with intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. On this appeal, they argue that the Government failed to establish that their businesses involved five or more persons for a period of 30 days or more, a jurisdictional prerequisite to both statutes. We reverse all the convictions and remand two of the cases for new trials.

I

This case arose from an investigation of illegal gambling in Weirton, Hancock County, West Virginia, during the fall of 1978. During that time, Ronald A. Donell, the Sheriff of Hancock County, assisted West Virginia State Police and the Federal Bureau of Investigation in surveilling and investigating five illegal gambling establishments in Weirton. Agents placed bets at the various establishments on numerous occasions between September 30, 1978, and January 20, 1979. In addition, Sheriff Donell acted as an undercover agent in receiving the bribes from the gamblers, which he divided with Robert G. Altomare, the Hancock County Prosecutor. On January 26, 1979, State Police raided all five operations and seized evidence including currency, records and gambling paraphernalia.

Appellants Gresko, Julian and Berardinelli, along with Prosecutor Altomare, were charged in a three count indictment. The

first count charged that all three appellants and Prosecutor Altomare conspired to obstruct justice by bribing Altomare not to enforce State gambling laws, a violation of 18 U.S.C. § 1511. On motion of the appellants, Altomare's case was severed and he was tried separately and convicted. Count II charged appellants Julian and Berardinelli with conducting an illegal gambling business in violation of 18 U.S.C. § 1955. Count III charged appellant Gresko with a similar violation of § 1955.

The Government's case consisted primarily of testimony by State police officers about bets they had placed in the various gambling establishments in Weirton. Sheriff Donell authenticated audio and video tape recordings and explained the circumstances surrounding his recorded conversations with Prosecutor Altomare and with Gus Karas, who allegedly paid the bribes on the behalf of defendants. Although Karas was not called to testify, the parties stipulated he would have testified that the tapes accurately reflected his conversations with the Sheriff and that he had received bribe money from appellant Julian with the understanding that it was being paid on behalf of appellant Gresko as well. Patricia Sauvageot testified that she and her husband maintained illegal multiple coin pinball machines in Julian's establishment and split the profits from those machines with him. Daniel Anthony Warrick testified that he delivered packages of parlay cards [1] to Gresko's establishment. FBI Special Agent William L. Holmes testified as an expert that records and other evidence seized in the January 26, 1979, raids showed numerous similarities between the five Weirton gambling operations.

District Judge Charles H. Haden, II, entered a judgment of acquittal for Berardi-

nelli on the conspiracy count at the close of the Government's case. The defendants presented no evidence. The jury convicted Julian and Gresko of conspiring to obstruct local law enforcement with intent to facilitate an illegal gambling business and all three appellants of operating an illegal gambling business.

Three principal issues have been raised before this court by the appellants. First, they challenge the decision of the district court to admit Sheriff Donell's taped conversations with prosecutor Altomare and with Gus Karas under the co–conspirator exception to the hearsay rule. Second, they question whether there was sufficient evidence to show that they operated illegal gambling businesses as that term is defined in 18 U.S.C. §§ 1511 and 1955. Third, they argue that the district court erred in instructing the jury on the definition of an illegal gambling business. We deal with these contentions seriatim.

## II

The Government's theory under Count I of the indictment was that Prosecutor Altomare extorted bribes from the Weirton gambling operations by threatening to close them down unless they each paid him $600 per month. The threat was communicated through Gus Karas, who operated a gambling business at the North End Bus Terminal. Karas apparently was able to buy Altomare's cooperation for $1500 per month, or the equivalent of $300 from each operation. According to the Government, Karas collected the money each month from Julian, Gresko and Ron Karas, added $600 himself,[2] and gave the money to Sheriff Donell to divide with Altomare.

The Government sought to introduce various audio and video tape recordings of

---

1. According to the Government's witnesses, parlay cards are consecutively numbered sheets of paper, each of which lists the college and professional athletic contests to be played during the upcoming wagering period. Each team is assigned a number and all the numbers also appear on a detachable portion of the card. To place a parlay wager, the bettor circles the numbers on both portions of the sheet that

correspond to the teams on which he wants to bet. He then separates the halves, retains one for reference and gives the other to the gambler with whom he is betting.

2. Gus Karas told Sheriff Donell that he did not wish to deal with the fifth operator, Steve Spensky, and would pay Spensky's share himself.

Sheriff Donell's conversations with Altomare and with Gus Karas. In one conversation, Altomare explained the bribe arrangement to Sheriff Donell and named each of the five gamblers who was to contribute. In another conversation, Gus Karas mentioned each of the five gambling operations which were to be protected and expressed his desire to avoid a combination that would bring the federal gambling statute, 18 U.S.C. § 1955, into operation.

The appellants objected that the tapes are hearsay and inadmissible. The Government responded that they represent statements by co-conspirators in furtherance of the conspiracy and hence are admissible under Fed.R.Evid. 801(d)(2)(E), the co-conspirator exception to the hearsay rule. At the close of the Government's case, the district court held that the Government had produced sufficient independent evidence to establish that Julian and Gresko were involved in the conspiracy to bribe Altomare and the recorded statements of Altomare and Gus Karas could be admitted under the co-conspirator exception.

■ In *United States v. McCormick*, 565 F.2d 286, 289 (4th Cir. 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978), this court stated the controlling principle: "there must be independent evidence of his participation in and the conspiracy itself to permit admission into evidence against him of declarations made by co-conspirators." Independent evidence is evidence other than the alleged co-conspirator statements themselves. "Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). *See also United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir. 1976). Although the independent evidence need not establish the participation of the defendant in the conspiracy beyond a reasonable doubt, *United States v. Jones*, 542 F.2d 186, *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976), it must be sufficient at least to take the question to the jury. *United States v. Stroupe, supra*, 538 F.2d at 1065. Absent

such independent evidence, the proffered statements are inadmissible hearsay.

■ We have no difficulty finding there was sufficient independent evidence connecting appellant Julian with the conspiracy to justify admitting the recorded co-conspirator statements against him. Sheriff Donell testified Gus Karas paid him $1,500 on three occasions in return for his and Altomare's agreement not to close down the five Weirton gambling establishments. The parties stipulated that Karas would have testified he received part of the bribe money from appellant Julian. Such testimony would have been based on Karas' personal knowledge and admissible as non-hearsay evidence of Julian's involvement. This independent evidence established a predicate for admitting the out of court co-conspirator statements against Julian.

■ Gresko, however, is another matter. Although Sheriff Donell's testimony alone was sufficient to make out a prima facie case of a conspiracy to bribe Altomare, the Government presented no independent evidence to show Gresko was involved. Karas' stipulated testimony that he understood part of the bribe money came from Gresko was based on an unnamed declarant's out of court assertion that this was so. Since that assertion is relevant only to show involvement by Gresko, it is inadmissible hearsay. Only if the out of court declaration was a co-conspirator's statement could it have been related by Karas from the witness stand. A co-conspirator's out of court statement is not independent evidence of the very conspiracy on which its admissibility depends. *See Glasser v. United States, supra*, 315 U.S. at 75, 62 S.Ct. at 467. Accordingly, Karas' stipulated testimony provides no independent evidence of Gresko's involvement. The Government's remaining evidence, that Gresko operated a large scale gambling business, that he used the same line and dealt with some of the same bettors as the other gamblers and that he continued to operate his business after Altomare demanded money from Karas, is as consistent with Gresko's non-involvement as with his involvement. Finding insuffi-

cient independent evidence to connect Gresko with the conspiracy, we hold the district court erred by admitting the Karas and Altomare statements against him.

■ Since the independent evidence alone was not enough to present a jury question as to Gresko's involvement in the conspiracy, and since the co–conspirator statements should not have been admitted against him, there is insufficient evidence to support Gresko's conspiracy conviction. The district court should have entered a judgment of acquittal for Gresko on Count I without submitting the issue to the jury.

### III

18 U.S.C. § 1955(a) makes it a federal offense to operate on a large scale a gambling business that is illegal under state or local law. Section 1955(b)(1) specifies which gambling businesses fall within the federal prohibition:

(b) As used in this section–

(1) "illegal gambling business" means a gambling business which–

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

The appellants concede that their operations were illegal under West Virginia State law for purposes of this appeal. The Government has not argued that either business grossed $2,000 on any single day. The Government's approach has been to prove that each operation involved five or more persons and remained in substantially continuous operation for more than 30 days. The theory of appellants has been that their operations, while illegal under State law, did not satisfy the federal statute's five person/thirty day jurisdictional prerequisite. We first construe the statute and

then apply our construction to the facts of each case to resolve the dispute.

Section 1955 was enacted as part of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922. The legislative history of this section shows Congress was concerned primarily with the syndicated activities of organized crime, not with small scale local enterprises:

The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business–type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function. H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4007, 4029.

■ It is clear that Congress imposed the five person, thirty day requirement as a means of screening out those gambling businesses that are too insignificant to warrant federal action. In accordance with that purpose, we hold that § 1955 prohibits only those gambling operations that involve at all times during some thirty day period at least five persons who "conduct, finance, manage, supervise, direct, or own" the business. *See United States v. Tarter,* 522 F.2d 520, 526 (6th Cir. 1975); *United States v. Marrifield,* 515 F.2d 877, 882 (5th Cir.) *cert. denied,* 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975); *United States v. Bridges,* 493 F.2d 918, 922 (5th Cir. 1974). Since the magnitude of a gambling business does not depend on the identities of its operators, we hold that the statute does not

require a showing that the same five people were involved for the entire thirty day period. However, there must be evidence that the business involved at least five people at all times for thirty days. A four person operation with changing personnel would be outside the reach of the statute. *United States v. Marrifield, supra*, 515 F.2d at 882.

■ Applying this standard to the cases at bar, we find the evidence sufficient to support the convictions of Julian and Berardinelli. However, even viewed in the light most favorable to the Government, *see Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978) and *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence is insufficient to sustain Gresko's conviction.

The Government's evidence regarding appellant Julian's Corner Store gambling operation was as follows: West Virginia State Police officers testified they placed bets with Julian on September 30, 1978, December 16, 1978, and January 7, 1979. Berardinelli took bets on September 30, 1978, November 11, 1978, December 16, 1978, and January 8 and 23, 1979. Patricia Sauvageot testified she and her husband owned, serviced and shared in the profits from illegal multiple coin pinball machines in the Corner Store from November 1978 to January 1979. An individual identified as Richard Fletcher took bets on October 21, 1978, and made changes in the odds and point spreads shown on the Corner Store's line board[3] on January 20, 1979.

Accepting all the Government's evidence as true, the jury could have found that Julian conducted the Corner Store's gam-

bling business from September 30, 1978, to January 7, 1979; Berardinelli conducted the business from September 30, 1978, to January 23, 1979; and Richard Fletcher conducted the business from October 21, 1978, to January 20, 1979. The Sauvageots admittedly were involved from November 1978 to January 1979 and may be included in the jurisdictional five persons, *see United States v. Crockett*, 514 F.2d 64, 74–75 (5th Cir. 1975). Accordingly, the jury could have found five people conducted, financed, managed, supervised, directed or owned all or part of the Corner Store's gambling business throughout the months of November and December 1978. The evidence is sufficient to sustain the convictions of Julian and Berardinelli.[4]

Gresko presents a more difficult question. Viewing the evidence in the light most favorable to the Government, the jury could have found that Lou Gresko conducted the illegal gambling business at Lou's Place from September 30, 1978, to January 11, 1979. There was testimony that Bill Gresko, Lou's brother, took bets on October 31, 1978, and December 6, 1978. The jury could have found he conducted the business continuously during the intervening five week period. Lou Gresko, Jr., the appellant's son, allegedly took bets on January 7 and 20, 1979. An individual variously identified as Nick and Weasel took bets on September 30, 1978, and November 11, 1978. However, even viewed in the light most favorable to the Government, this evidence shows there was only one short period, from October 31, 1978, to November 11, 1978, during which as many as three people took bets at Lou's Place. At all other times, the number was two.

---

3. The Government's witnesses described a "line board" as a chalk board listing the various athletic contests to be played during the upcoming wagering period and noting the point spread in each contest. "Point spread" is the number of points that must be added to the disfavored team's expected score to make the contest an even bet. A bettor wins his bet if his team scores enough points to win the game after the point spread is taken into account. *See United States v. Thomas*, 508 F.2d 1200, 1202 n. 2 (8th Cir.), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975).

4. Furthermore, 18 U.S.C. § 1511, the section that forms the basis for the Count I obstruction of justice charge, contains an identical five person/thirty day jurisdictional prerequisite. Since the statute requires only that one of the conspirators conduct, finance, manage, supervise, direct or own an illegal gambling business, the Government's evidence against Julian under Count II satisfied the jurisdictional requirements of Count I as well.

The Government seeks to circumvent this deficiency in its proof by including among the jurisdictional five persons Gus Karas, Prosecutor Altomare, Danny Warrick and Joe Morgan. Gus Karas bribed Altomare, allegedly on behalf of all the gambling operations in Weirton, including Lou's Place. There also was expert testimony that Karas acted as a layoff source[5] for Julian's Corner Store. Prosecutor Altomare accepted bribes in return for allowing the Weirton gambling businesses to continue operating. Danny Warrick, an employee of the Weirton bus terminal, delivered bundles of parlay cards to Gresko's operation. In return, Gresko occasionally tipped Warrick or let him place free bets. Morgan, who apparently had no other connection with any of the businesses, supplied the parlay cards that Warrick delivered. All of these people were necessary to Gresko's business, the Government argues, and may be included in his operation for purposes of establishing jurisdiction under § 1955. We disagree.

As demonstrated in Part II of this opinion, there is no independent evidence to show Gresko was a part of the conspiracy to bribe Altomare. Accordingly, out of court statements by Gus Karas and Altomare were inadmissible to show that Karas bribed Altomare on Gresko's behalf. All of this being so, there is no admissible evidence that either Karas or Altomare had any dealings or connection with Gresko's gambling business. Therefore, neither can be included under the bribe theory in the jurisdictional five.

Nor, despite the contrary ruling of the district court, can Karas be included as a layoff source for Lou's Place. Whether or not the exchange of layoff bets without more is enough to connect two otherwise independent gambling operations, see United States v. Guzek, 527 F.2d 552, 557–58 (8th Cir. 1975), there is no evidence that Gresko's operation ever laid off to Gus Karas.

Without either Gus Karas or Altomare, the Government's case against Gresko falls short of meeting the five person/thirty day requirement. Even assuming both Morgan and Warrick may be included in the jurisdictional five,[6] the evidence shows no period of thirty days during which any five people were continuously involved in operating Lou's Place. Viewing the evidence in the light most favorable to the Government, the jury could have found Lou Gresko, Bill Gresko, Nick (Weasel) Morgan and Warrick conducted a gambling business together at Lou's Place, but only from October 31, 1978, to November 11, 1978, a period less than the requisite thirty days in duration. This evidence is insufficient to support Gresko's conviction. Only when size and duration coalesce is the Government's theory proven. Accordingly, Gresko's conviction under Count III for operating an illegal gambling business must be reversed.

## IV

Finally, Julian and Berardinelli argue that the district court erred in charging the jury on the essential elements of an illegal gambling business. The court instructed the jury in the following language:

Now, the five persons, and I am going to have extensive coverage on that. It is not necessary to show involvement of the

5. A "layoff source" is a person who accepts "Layoff bets" from a gambling business. "Layoff bets" are bets a gambler makes to balance his own book. When a gambler has more money bet on one side of a contest than on the other, he may win heavily or lose heavily. The ideal is to balance the book so that regardless of which team wins, the gambler will break even. He still earns a profit by collecting a commission, usually ten per cent, on his customers' losing bets. Therefore, a gambler will lay off excess bets to another gambler so that, to the extent he loses to his own customers, he wins back from his layoff source and breaks

even. See generally United States v. Box, 530 F.2d 1258, 1261–62 (5th Cir. 1976).

6. But see United States v. Todaro, 550 F.2d 1300, 1302 (2d Cir.), cert. denied, 433 U.S. 909, 97 S.Ct. 2975, 53 L.Ed.2d 1093 (1977) (insignificance of the defendant's part in a gambling operation made him a comparative outsider who can not be counted in the jurisdictional five). See also United States v. McCoy, 539 F.2d 1050 (5th Cir. 1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); United States v. Leon, 534 F.2d 667 (6th Cir. 1976).

same five persons for thirty continuous days. It is not necessary for the Government to show that the same five persons were involved in an illegal gambling business for thirty days. It is, however, necessary to show that such a business was in continuous operation for thirty days or more and that five or more persons were involved in the operation of the business in any of the capacities which I have previously defined.

Under the quoted instruction, the jury may have believed they could find the defendants guilty of conducting an illegal gambling business if the business merely involved five people at one time or another and operated for more than thirty days. As we have held in Part III of this opinion, such is not the law. In view of the bare sufficiency of the Government's proof on this issue, there is a substantial likelihood that the error was prejudicial. Since the five person/thirty day requirement is a jurisdictional prerequisite to both the gambling and obstructing justice charges, the prejudicial effect of the instructions could have tainted Julian's conviction under Count I as well. Accordingly, Julian's convictions under Counts I and II, and Berardinelli's conviction under Count II must be reversed and the cases remanded for a new trial under proper instructions.

We have considered the appellants' remaining assignments of error and find them without merit.

The convictions of Gresko under Counts I and III of the indictment are reversed and his case is remanded to the district court with directions to dismiss the charges against him. The remaining convictions are reversed and remanded for a new trial.