UNITED STATES of America, Appellee,

v.

Thomas Lee SHURSEN, Appellant.

UNITED STATES of America, Appellee,

v.

Thomas Gerald MOGREN, Appellant.

UNITED STATES of America, Appellee,

v.

Gary Andrew SWANGSTUE, Appellant.

UNITED STATES of America, Appellee,

v.

Roger McQUAID, Appellant.

UNITED STATES of America, Appellee,

v.

Larry Raymond PRICE, Appellant.

UNITED STATES of America, Appellee,

v.

Robert Eugene SHURSEN, Appellant,

UNITED STATES of America, Appellee,

v.

John Ernest CAPRA, Appellant.

Nos. 80–1801 to 80–1805, 80–1903 and 80–1926.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1981.

Decided June 5, 1981.

Rehearing and Rehearing En Banc Denied July 6, 1981.

Thomas K. Berg, U. S. Atty., Richard E. Vosepka, Asst. U. S. Atty., District of Minnesota, (argued), Minneapolis, Minn., Dwight L. Pringle, Peter H. Bachman, Legal Interns, for appellee.

Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Carol Grant, William J. Mauzy (argued), Minneapolis, Minn., for appellants.

Gray, Gill & Brinkman, Earl P. Gray (argued), St. Paul, Minn., for appellant Shursen.

Before HEANEY, Circuit Judge, PECK,* Senior Circuit Judge, and HENLEY, Circuit Judge.

HENLEY, Circuit Judge.

A grand jury charged that from September 11 to December 5, 1979 five or more persons, including the appellants, conducted an illegal gambling business in the style of a floating blackjack game, in violation of

---

* The Honorable John W. Peck, United States Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

the laws of Minnesota, and that the gambling business had a gross revenue of $2,000.00 in a single day; in violation of 18 U.S.C. § 1955. The appellants were jointly tried and convicted. Appellant Capra received a two year sentence and a fine of $5,000.00, and appellant Robert Shursen received a one year sentence and a fine of $5,000.00. All other appellants received fines of $2,000.00, with imposition of any other sentence suspended, and two years probation. All filed timely notices of appeal.

A blackjack game began in the fall of 1978. Originally several members of the Indian Hills Country Club in St. Paul played the game after completing their golf games. Soon they played blackjack on a weekly basis, on Tuesday nights. This game continued until early summer 1979, when backers of the game terminated it because they were losing money.

After three or five weeks, a second Tuesday night blackjack game began under new ownership. Professional "Las Vegas style" equipment was used in the second game. Various locations in the St. Paul area were used for the game, which drew up to twenty players per night. Bets ranged from $10.00 to $200.00; occasionally the maximum was raised to $400.00. The game was limited to members of the country club and their friends; it was never open to the general public.

Management and operation of the game was divided among owners, dealers and pit bosses. Owners provided financial backing for the game. Dealers were paid one hundred dollars per night, and in addition shared equally tips from the players. The pit boss provided credit and chips for players and paid the dealers. Players without funds signed a "marker," a note promising to pay the pit boss.

Sometime in the beginning of September 1979 two unidentified sources informed the FBI about the game, and future locations of it. Thereafter, various FBI agents set up surveillance on late Tuesday afternoons of Thomas Shursen's house and the game sites. Agents determined that Thomas

Shursen transported equipment to the game, and that a card game with chips and I.O.U.'s in fact was taking place.

On December 4, 1979, a Tuesday, agents obtained search warrants for Thomas Shursen's house and car, and for that evening's game location. The warrants were executed simultaneously. At Thomas Shursen's house, agents found a blue ledger and customer checks inside a basement safe. At the game, agents found Price and Swangstue dealing, and McQuaid playing. Capra, Robert Shursen and Mogren were not present. Thomas Shursen was present, and a search of his person revealed cash, twenty-two markers, and a list of telephone numbers of players and dealers.

At trial the various appellants were characterized roughly as follows:

Thomas Shursen—pit boss
Mogren—dealer, pit boss
Swangstue—dealer
McQuaid—dealer
Price—dealer
Robert Shursen—owner
Capra—owner

Much of the government's case depended upon testimony of witnesses who were involved in the game. These witnesses were all friends of the appellants and were hostile to the prosecution. They gave inconsistent and evasive answers. Their uncooperative attitude is the source of alleged prosecutorial misconduct and allegedly improper comments of the trial court.

In addition to allegations of prosecutorial misconduct and partiality on the part of the trial judge, the appellants urge numerous other grounds for reversal. They allege the trial court erred in denying their motion for disclosure of names of informants. They claim further that the affidavit in support of the search warrants was insufficient to establish probable cause, and that even if it was sufficient two gambling ledgers found during the searches were inadmissible. Appellants also urge error in the trial court's instructions. They also claim that the evidence established no violation of Minnesota law. Finally, appellants Mogren, McQuaid,

Robert Shursen and Capra urge that even if the evidence established the existence of an illegal gambling operation, the evidence failed to establish that they backed or conducted it. We reject these contentions, and accordingly affirm the convictions.

*(1) Conduct of the trial court and the prosecutor.*

■ We have carefully reviewed the transcript in this case, and we are convinced that no prejudice accrued to any of the appellants as a result of the trial judge's comments in this case. While it is true that the judge interrupted frequently and actively, he did so primarily because the witnesses gave vague, evasive or inconsistent testimony.[1] "It is the trial court's duty to clarify the testimony of a witness in order to avoid any misunderstanding of the testimony by the jury." *United States v. Cooper*, 596 F.2d 327, 330 (8th Cir. 1979).

■ We also find no error resulting from the prosecutor's conduct of the trial. He was faced with hostile witnesses, and in the circumstances leading questions were necessary. *Cf.* Fed.R.Evid. 611(c). In argument the prosecutor was vigorous and at times interrupted summations of defense counsel but we find nothing in his conduct transgressing the bounds of legitimate advocacy. *United States v. Thiel*, 619 F.2d 778 (8th Cir. 1980).

*(2) The trial court's refusal to order disclosure of informants.*

■ When presented with a defendant's motion to disclose informants, a district judge should weigh "the public interest in protecting the free flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957). Appropriate considerations include relevance of the informant's testimony to possible defenses, and the availability of other witnesses. *Id.* at 62–64, 77 S.Ct. at 628–29.

■ It is evident from the affidavits here presented in support of the search warrants that the informants participated in the game. Their testimony possibly could have aided the defense that the game was more social than commercial in nature.[2] However, the game regularly drew up to twenty players. Thus, there is little reason to think that the informants possessed any unique information regarding the game; the defense could have called any players it wanted to testify about the nature of the game. In the circumstances, disclosure of the identity of the informants would have been of minimal use to the defense, and the trial court correctly refused to order it.

*(3) The affidavit in support of the search warrant.*

The affidavit states that two confidential sources have provided information regarding the operation of an illegal gambling enterprise to certain named FBI agents. Both sources allegedly stated that Capra and Robert Shursen owned the game, and that Mogren managed it. One source stated that the game was only held Tuesday nights and named as dealers Tom Shursen,

---

1. We think the words of Judge Moore in a similar context are particularly appropriate here:

   [E]very judge has his own individual manner of conducting a trial and, of necessity, must have great leeway in so doing. Even appellate decisions cannot reduce the judicial personality to a common colorless denominator. In this particular case, the judge, as has been his wont during his tenure in office, followed the case closely and took an active part therein. However, whatever he did or said in the presence of the jury was undoubtedly weighed by the jury along with all other factors in evaluating his personality. And as long as the jury system endures, it is premised on their strict adherence to the admonition, here properly given in the charge, that: 'you are not to construe that [questions by the judge] at all as indicating that the Judge has any ideas about who should prevail in this case at all. It is done for the purpose where the Court thinks it appropriate to make something clear, and that is all.' *United States v. Guglielmini*, 384 F.2d 602, 608 (2d Cir. 1967) (dissenting opinion).

2. This we doubt. In view of the fact that these people informed the FBI of the game, it is unlikely that they regarded it as highly social.

"Moon" Mullen and Gary Swangstue. Both sources allegedly gave details of how the game was run, and the dates and locations for future games.

The affidavit then details FBI surveillance. Tuesday nights, at the locations specified, FBI agents observed cars registered to or leased by Mogren, McQuaid, Mullen, Capra, Swangstue and Thomas Shursen. (Not all cars were observed on all nights.) Agents determined that a card game with chips was taking place. One night agents retrieved two garbage bags containing markers (I.O.U.'s), which had been discarded by a person who closely resembled McQuaid and by someone else.

The warrants were issued in the late afternoon or early evening of December 4, 1979 after FBI agents observed Thomas Shursen load items in his car in front of his house, and later observed cars belonging to Thomas Shursen, Gary Swangstue and Roger McQuaid at the Roseville Professional Center. December 4, 1979 was a Tuesday. Pursuant to the warrants FBI agents simultaneously conducted searches of Thomas Shursen's house and car and the Roseville Professional Center basement.

Appellants contend that the information in the affidavits fails to establish probable cause that a crime was occurring. Specifically, appellants contend that while the affidavit may establish probable cause that a gambling game is taking place, it fails to establish probable cause that illegal gambling is taking place. As discussed *infra*, Minnesota law prohibits gambling, but exempts social betting.

■ We find this contention frivolous. The affidavit states that the markers which FBI agents retrieved showed dollar amounts in the hundreds and in one case two thousand. Further, the affidavit alleges that one of the confidential sources stated that the house won $25,000.00 on September 4, 1979. While the line between social and illegal gambling may be hard to draw, we think that notes in the hundreds and house earnings of $25,000.00 clearly indicate more than social gambling.

Appellants also contend that even if there was probable cause to justify the search of the Roseville Professional Center basement, there was no probable cause to believe that evidence of the crime would be found in Thomas Shursen's house. Because the game was in progress, and because agents observed Thomas Shursen load items into his car before the game, there is at least some merit to the contention that any evidence of the game would be found at the game, and not at the house.

■ The affidavit in the instant case indicates that prior to December 4, 1979 agents observed Thomas Shursen take gambling equipment from his house to his car, take it to the game, and bring it back at the end of the game. Although on December 4, 1979 the agents had already observed Thomas Shursen load some items into his car and take them to the game, the agents had no reason to think that he had taken all the equipment or evidence to the game on December 4 or on any other date. Indeed, prudence and reason supported immediate search of both the residence and the game site. While we find that there was probable cause to believe that some game equipment would be found at Thomas Shursen's residence, we observe in addition that when in a particular case it may not be easy to determine that an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area may be determined by the preference to be accorded to warrants. *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

*(4) Competency of the ledgers.*

We think that there was ample evidence that the ledgers were authentic—that is, that they were ones which recorded transactions of the game. First, one witness, the dealer named Mullen, identified the ledgers as ones which were kept for the games. Second, the ledgers look like records of a gambling game—there are entries for dealers, markers, players and entries which look like they are for owners. Further, the names in the ledgers correspond to participants in the game.

■ We also think that the ledgers are not hearsay. *United States v. Wilson*, 532 F.2d 641, 643 n.2 (8th Cir. 1976). Under Fed.R.Evid. 801(d)(2)(E), a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." This rule applies even in the absence of a conspiracy charge, as long as there is independent evidence of concerted action. *United States v. Smith*, 596 F.2d 319, 321 (8th Cir. 1979).

Here, there is both testimony and physical evidence of a conspiracy to conduct an illegal gambling game. While it is clear that some of the ledger material was written before the time charged in the indictment, there was independent evidence that the conspiracy began before this time. Finally, there can be no question but that the ledgers were kept "in furtherance of" the conspiracy; records were needed because of the large amounts of cash wagered.

■ Appellants argue that even assuming independent evidence of conspiracy, there was insufficient independent evidence of their involvement in it. "The requirement for admissibility of [Fed.R.Evid. 801(d)(2)(E)] testimony is satisfied by showing likelihood of illicit association between the declarant and the defendant." *United States v. Sanders*, 463 F.2d 1086, 1088 (8th Cir. 1972).

In this case, there was independent evidence that two of the declarants were Mullen and Thomas Shursen,[3] and that they were involved in the game as dealer and pit boss, respectively. We think it clear that whoever else wrote entries must have participated in the game in some fashion because Thomas Shursen kept the ledgers, and the game was never open to the general public.

There was independent evidence that McQuaid, Swangstue and Mogren were involved in the game as dealers. Finally, one witness (a dealer) testified that Robert Shursen and Capra would come to the game

and deal a few hands, but they did not get paid; other dealers did get paid, and the witness therefore assumed Robert Shursen and Capra owned the game.

We conclude that the "likelihood of illicit association" standard of *Sanders, supra*, was satisfied as to all defendants and that the trial court did not err in admitting the ledgers.

*(5) The trial court's instructions.*

■ In his reply brief appellant Capra argues for the first time before us the question whether the district court erred in instructing that the elements of section 1955 did not have to coalesce. The argument was made in terms of a requirement that the alleged offense must have involved five or more persons continuously for more than thirty days. The statute provides in pertinent part:

(a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

The district court instructed the jury that it was necessary for the government to show involvement of five or more people and a two thousand dollar night, but that it was not necessary to show that these elements occurred on a single day. The indictment

---

**3.** Mullen testified that he was a dealer, and that he made some of the ledger entries. He also testified that Thomas Shursen kept the ledgers. The FBI found one of the ledgers at Thomas Shursen's house. A player testified that Thomas Shursen extended credit and settled accounts; it is therefore likely that he wrote down entries to reflect these transactions.

permissibly is based upon the $2,000 day alternative to the thirty day period of operation. *United States v. Tarter*, 522 F.2d 520, 526 n.2 (6th Cir. 1975).

The belated argument by Capra was prompted by the then recent decision in *United States v. Gresko*, 632 F.2d 1128 (4th Cir. 1980), a case in which there was a thirty day period but not a $2,000 day. There the district court instructed that it was not necessary for the jury to find that five persons were involved in the gambling business for each of thirty days. The Fourth Circuit held this instruction erroneous, and ruled that the government was required to show that the gambling operations involved at least five people at all times during the thirty day period (although not necessarily the same five).[4] The court reasoned that Congress intended to reach only organized, large scale operations, and that the thirty day, five person requirement was placed in section 1955 to screen out smaller operations. *Id.* at 1132–33.

■ Assuming that Capra's argument is properly before us and that *Gresko* is applicable here, we think that the trial court might well have given a different instruction on the need for the jury to find a two thousand dollar day on which five or more people were involved. However, the error, if any, was harmless in light of the very substantial evidence that more than five people were involved in running the business, and that on many (if not all) nights the revenues exceeded $2,000.

### (6) *Minnesota law.*

Section 1955, quoted above, requires a violation of state or local law. The indictment in the instant case charged a violation of Minn.Stat.Ann. § 609.76. This statute makes it illegal, *inter alia*, to maintain or operate a gambling place, or to intentionally participate in the income of a gambling place. "Gambling place" is defined in Minn.Stat.Ann. § 609.75, subd. 5, as "a location ... wherein ... betting is permitted or promoted ...." Minn.Stat.Ann. § 609.-75, subd. 3(5) excludes from "bets" "[a] private social bet not part of or incidental to organized, commercialized, or systematic gambling."

■ Appellants contend that the blackjack was merely a private social game among golfing friends, and that therefore there was no state law violation. Because there was no state law violation, they contend, there was no federal violation.

Even if the players regarded the game as sociable, we find that the size of the bets rendered the game rather unsocial.[5] The ledgers and some of the testimony demonstrated that large amounts of money were wagered at the games. We also find that the bets were "incidental to organized" gambling. By arrangement the game changed locations every Tuesday night, and someone called the players and dealers to inform them of the locations. Dealers and pit bosses were paid. Finally, records were kept, and Las Vegas style equipment was used for the games.

### (7) *Sufficiency of the evidence.*

#### (a) *Thomas Mogren*

■ Three witnesses testified that Mogren was a dealer, and one of them indicated that Mogren was a dealer during the time period charged in the indictment. "Tom M." appears on the list of dealers for September 11, and one witness stated that Mogren was the only "Tom M." who was a dealer. Further, "Mog" appeared on a list of dealers and their telephone numbers found on the person of Thomas Shursen at the time of the FBI raid. Finally, one witness stated that Mogren and Thomas Shursen were pit bosses in the fall of 1979.

---

4. *Compare United States v. Marrifield*, 515 F.2d 877 (5th Cir. 1975), where five appellants freely interchanged roles but no more than four were actually present at any one time. There the court held that the fact only four were engaged at a particular time in running a business which contemplated and took advantage of the active participation of five is without decisional significance, 515 F.2d at 881.

5. We have not found any Minnesota case which interprets the meaning of "social" betting.

Viewing the evidence most favorably to the government, the conviction of Mogren must be upheld.

### (b)  Roger McQuaid

The name "Roger" appears in the ledger in the lists of dealers for September 11 and for October 30. One witness thought that he had seen McQuaid deal twice, in November or September. There was testimony that McQuaid cheated in favor of the players on October 30, and the ledger entries for that date indicate high tips for dealers. Although cheating the house demonstrates disloyalty, it also shows that McQuaid was no stranger to the game, or else the pit boss would have prevented the cheating.

Evidence was presented that McQuaid reserved rooms for the game on four occasions during the time of the indictment. Once he provided beer for the players.

Again, we find the evidence sufficient to sustain the conviction.

### (c)  Robert Shursen

The government's theory was that Robert Shursen and Jack Capra [6] owned the game. Various witnesses were evasive about the roles of these two defendants in the game. However, one witness, a player, stated that he saw Robert Shursen deal a time or two in the fall of 1979, and that Robert Shursen paid him (the witness) a couple of times. Another witness testified that Robert Shursen and Capra dealt but did not get paid which led him to believe that Robert Shursen and Capra owned the game. And another witness testified that he thought Robert Shursen must have looked at the ledgers during the fall of 1979. This witness assumed that Robert Shursen and Capra owned the game.

The names "Bob" and "Jack" and numbers appear close together numerous times in the ledgers. Although there was another "Bob," Robert Mullen, this person had the nickname "Moon," and there are ledger pages where "Moon" is listed under dealers and "Bob" appears elsewhere.

An FBI agent testified that on September 11, 1979 he saw Robert Shursen go into the room where the game was being held. Robert Shursen sat down at a table, and then he began to hold some white pieces of paper. The jury could reasonably have inferred that the pieces of paper were "markers" (the notes promising to pay the pit boss). It is well established that an appellate court "must accept as established all reasonable inferences from the evidence that tend to support the action of the jury." *United States v. Overshon,* 494 F.2d 894, 896 (8th Cir.), *cert. denied,* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974).

We find the evidence sufficient to sustain the conviction of Robert Shursen.

### (d)  John Capra

There was testimony from one witness, a dealer, that he saw Capra occasionally at the game during the fall of 1979. This person stated that Capra did not have much to do with the game. He would deal once in a while; he did not get paid like other dealers. The fact that Capra and Robert Shursen did not get paid led this witness to believe that they owned the game. However, there were others who dealt and did not get paid.

Another witness, a player, stated that Capra paid him on occasion. This witness was not sure of the dates on which Capra paid him, or the amounts. The witness also stated that after September, Capra would come in a few times and deal a few hands; he did not know if Capra was paid to deal.

Another witness, a dealer, testified that he saw little of Capra after September, but if Capra came he probably would have looked at the ledger. Later he stated that sometime during the fall of 1979 he was sure Capra must have looked at the ledger. Finally, this witness assumed Shursen and Capra had to be the ones who assumed profit or loss from the game; if there had to be owners of the game, then it would be Robert Shursen and Capra.

---

**6.** Appellant John Ernest Capra evidently is known as "Jack" Capra.

Another witness, a player, stated that he saw Capra walk into the room where the game was being held probably twice in the fall of 1979. According to this witness, Capra did not play or deal, he just more or less observed, for five minutes perhaps.

An FBI agent testified that he saw Capra at the Summerfield Lounge of the Ramada Inn on September 11, 1979. The game that night was held at the Edinburg room of the Ramada, which was adjacent to the Summerfield Lounge. Capra was with Robert Shursen and Shursen's female companion for a few minutes, when the latter two left for the game. The agent did not say that Capra went to the game. He testified that he did not observe Capra near the game at any other time.

Another witness, the dealer Mullen, testified that both Mogren and Swangstue told him that Robert Shursen and Capra owned the game, but he did not recall when he had these conversations. The witness stated that the ledger entry "Jack—$5,460" would be a payoff to a player. This was further pursued by the prosecutor:

Q. What players around there do you know named "Jack"?

A. I think probably a couple.

Q. Can you tell us their names?

A. Jack Crawford—and I can't think of another player right now.

Q. Was Jack Crawford a regular player?

A. He was there on a couple of occasions, four or five.

Q. If I told you that there were entries for "Jack" or "Bob" frequently in these ledgers that are here, would you say that would be Jack Crawford?

A. No.

Q. Who would it be?

A. I have no idea.

After more questioning, the witness stated that he assumed the "Jack" would be Capra, because of the conversation with Mogren, and because he (the witness) saw Capra at the game.

While some of the evidence against Capra is somewhat equivocal, as was the evidence against Robert Shursen as well, it is fair to say that viewed most favorably to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence as a whole reflects at least that Capra had been involved to some extent in the games conducted prior to the indictment period; that during the indictment period he had been in or about the game room from time to time, that he had dealt cards and paid bettors on at least some occasions, and that he was the "Jack" listed in the records of the enterprise as one of these involved.

From these facts and in the setting of this case, the jury was warranted in finding, although it certainly was not required to find, beyond a reasonable doubt that Capra was one of those involved in the gaming enterprise and indeed that he was an owner of the game.

*(8)  Conclusion.*

For the foregoing reasons, the judgments of conviction against all of the appellants are affirmed.