UNITED STATES of America, Plaintiff-Appellee,

v.

Lewis K. TARTER et al., Defendants-Appellants.

No. 75–1238.

United States Court of Appeals, Sixth Circuit.

Aug. 25, 1975.

---

W. Robert Lotz, Jr., Combs & Oldfield, Covington, Ky., for defendants-appellants.

Eugene E. Siler, U. S. Atty., James E. Arehart, Asst. U. S. Atty., Lexington, Ky., for plaintiff-appellee.

Before CELEBREZZE, McCREE and LIVELY, Circuit Judges.

McCREE, Circuit Judge.

This appeal from convictions after a non-jury trial for violation of the federal gambling statute, 18 U.S.C. § 1955, presents two issues for review: (1) whether the evidence is sufficient to support the verdicts, and (2) whether the district court improperly revoked sentences of probation and substituted sentences of imprisonment after it learned that appellants had filed notices of appeal. We affirm the convictions of appellants Lewis Tarter, Sanford Rue, and Michael Grout but reverse the conviction of Leslie Cooper, and we hold that the district court erred when it revoked the sentences of probation after it learned that a notice of appeal from its judgment had been filed.

On September 17, 1973, twelve persons, including appellants Lewis Tarter, Leslie Cooper, Sanford Rue, and Michael Grout, were indicted for conducting an illegal gambling business in Covington, Kentucky, from January 26 to March 4, 1973, in violation of 18 U.S.C. § 1955. All defendants entered pleas of not guilty, and the case was tried without a jury on October 31 and November 1, 1973. At the conclusion of the government's case-in-chief, all defendants moved for a directed verdict of acquittal. The court granted the motion with respect to two of the defendants.

After hearing all the evidence, the court found the remaining defendants guilty and imposed the following sentences on appellants: Tarter received a $1,500 fine and a jail sentence of three months, and Cooper, Grout and Rue each received a $250 fine and a thirty day jail sentence. The jail sentences were suspended, however, and, in an order entered on November 7, 1973, the court placed all defendants on probation. Shortly thereafter, on November 16, four of the defendants filed a notice of appeal. On December 13 and on December 21, the court entered additional orders amending the judgments of the four defendants who had filed a notice of appeal. These orders recited:

On November 19, 1973, it appearing to the Court that the defendant . . . has filed a Notice of Appeal from the Judgment entered herein . . . it is ORDERED AND ADJUDGED that the Judgment of that date be, and it is hereby, amended in that the suspension of the period of imprisonment be, and it is, set aside . . . ..

As a consequence of the orders revoking probation, appellants were required to serve institutional sentences of the same duration as those that had been originally imposed and suspended. The court did not, however, amend its orders suspending the sentences of imprisonment of those defendants who elected not to appeal.

Section 1955 of Title 18 under which the prosecution was brought provides in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,-000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

The theory of the government in seeking the indictment that formed the basis of appellants' convictions was that Howard Donnelly, the proprietor of Howard's

Grill in Covington, Kentucky, and Lewis Tarter, the proprietor of the Pastime Cafe in the same city were the operators of a single gambling business conducted for more than thirty days by at least five persons at both of their establishments. Sanford Rue and Michael Grout, among others, were charged with being dealers at the poker games conducted at the Pastime Cafe, and Leslie Cooper was charged with being the dealer at the poker games conducted at Howard's Grill.

## THE GAMES AT HOWARD'S GRILL

There was little evidence presented concerning the number and the size of the poker games conducted at Howard's Grill. Howard Donnelly, who admittedly conducted poker games in the back room, had leased the building from November 1966 until March 1973, when a raid by federal agents terminated the operation. He paid the rent for the building with personal checks that he had cashed for his customers. Walter Spooner, an agent of the Federal Bureau of Investigation and the primary government witness, never attended a game at Howard's Grill but he did testify that Charles Livers, a defendant, had told him on February 25, 1973, of his participation in a game there. William Napier testified that during the period covered by the indictment he had played poker at Howard's Grill "once a month, sometimes more often." Calvin Bailey testified that he seldom played poker at Howard's Grill and that he doubted that he had played there during the early months of 1973. Donna Lunsford, who was employed at Howard's Grill two nights a week during the first three months of 1973, testified only that she "was aware of card playing during that time." The only other evidence concerning the operation at Howard's Grill was related by an agent who participated in the raid. He testified that Leslie Cooper had stated shortly after the raid that he was a dealer for Howard Donnelly and that he had in his possession poker game proceeds that belonged to the "house." A search of the restaurant yielded money wrappers and bill straps.

## THE GAMES AT THE PASTIME CAFE

There was more evidence presented concerning the poker games conducted at the Pastime Cafe. It was in a building rented by Lewis Tarter and its front windows were boarded up. Agent Spooner visited the Pastime on seven occasions during a thirty-eight day period in 1973: January 26, February 2, February 7, February 16, February 17, February 23, and March 4. He testified that Tarter showed him the location of the doorbell used by patrons of the games which were conducted in the back room of the cafe. On his first visit, no game was being played but Spooner was invited to attend a game scheduled for that evening. On each of his other visits, Spooner played poker and looked and listened for incriminating information. He testified that Joe Putthoff was a dealer on February 2 and 16; Tom Dietz, on February 17 and 25 and on March 4; Sanford Rue, on February 7 and 16; Michael Grout on February 7; Charles Livers on February 25 and March 4. Napier testified that Livers, Grout and Dietz were dealers at the poker games he attended; and Bailey testified that Dietz and Livers were regular dealers at the Pastime. Charles Livers was also identified as a person who answered the door during the games.

Agent Spooner also testified that Tarter told him on February 17 that the game in progress had been going on since February 15 without stopping. He later learned from Livers that the game had lasted until the next day. On February 25, Livers told Spooner about a game played on February 22 and stated that two tables were necessary to accommodate the persons wanting to play. A search of the Pastime yielded playing cards and a receipt made out to the Pastime Card Room.

In addition to showing that Lewis Tarter was the lessee of the Pastime and

the manager of its poker games and that Joseph Putthoff, Tom Dietz, Sanford Rue, Michael Grout, and Charles Livers acted as dealers (in addition to being players), the evidence also showed that Douglas Donnelly assisted Tarter in paying the rent occasionally, invited Spooner to play poker on his first visit, explained the rules of the game to him, seated patrons and acted as a dealer. Never, however, did more than two people act as dealers in an evening and except for March 4, when two games were in progress, never was there more than one person dealing at a time. Accordingly, on no occasion were more than two dealers and Tarter and Douglas Donnelly engaged in conducting the poker games at the Pastime Cafe.

The poker games were conducted in the same way on each occasion that Spooner visited the Pastime. The game was seven card stud with a fifty cent opener and a two to four dollar limit on raises. There were usually eight or nine participants, and two persons who alternated as dealers each hour. No chips were bought from the house and dollar bills and quarters were used. A dealer was entitled to withdraw fifty cents or one dollar for approximately every ten dollars in the pot. These proceeds were divided with the "house."

## THE CONNECTION BETWEEN TARTER AND HOWARD DONNELLY

Little evidence was introduced relevant to the question whether Tarter and Howard Donnelly were conductors of a single gambling business operated at both Howard's Grill and the Pastime Cafe. The record discloses only that Howard Donnelly was present at the Pastime on February 2 and 7 and on March 4 during poker games, and that he talked to Tarter on each occasion. There was also evidence that Howard Donnelly assisted Tarter in renting the Pastime by vouching for him to the lessor and by helping to pay the rent occasionally. The receipts for rental payments were, however, always made out to Tarter.

On appeal, it is argued that the conviction of Leslie Cooper, the dealer at Howard's Grill, should be reversed because the government failed to show, as it concedes it must, that Howard Donnelly and Lewis Tarter conducted a single gambling business, and that the convictions of the other appellants should be reversed because the government failed to show that the gambling business at the Pastime Cafe was "a five-man operation" for more than thirty days or that the business had gross revenues of more than $2,000 in a single day. The essence of appellants' contentions is that although the poker games at Howard's Grill and at the Pastime Cafe were admittedly illegal under Kentucky law, they did not constitute the "organized crime" over which Congress intended to assert federal jurisdiction. The government responds that even if the activity of appellants was not the primary concern of the Congress, the convictions must be upheld if the evidence is sufficient to meet the less stringent requirements of the language of 18 U.S.C. § 1955 which prohibits activity that does not necessarily constitute large-scale syndicated gambling.

■ Before a person may be convicted of being a participant in a gambling business prohibited by 18 U.S.C. § 1955, the government must demonstrate beyond a reasonable doubt the existence of a "gambling business" that "involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business," and that "has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." 18 U.S.C. § 1955. In determining whether there is sufficient evidence to support a conviction, we view the evidence in the light "most favorable to the Government." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ Before we can review the evidence, however, we must determine the

legal standards against which the evidence must be measured. This is a difficult task in this case because although the language of the statute is easy to state, it is susceptible to two interpretations and the scope of its prohibition is broader than the criminal activity that prompted its enactment. *See United States v. Bridges,* 493 F.2d 918 (5th Cir. 1974). In this appeal, the government does not dispute appellants' contention that a gambling business of the character and size of those conducted at Howard's Grill and the Pastime Cafe was not Congress' primary target in enacting section 1955.[1] Nevertheless, Congress is permitted, under appropriate circumstances, to determine whether a class of activity affects interstate commerce, and to define the part of the class over which it will assert federal jurisdiction and "courts have no power 'to excise, as trivial, individual instances' of the class." *Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971), *quoting Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968).

The observation that Congress has the power to define a class of activities subject to federal regulation does not, however, absolve courts of their duty to examine criminal statutes to determine the scope of the class of activities subject to federal jurisdiction in light of well-known principles of statutory construction. Courts are permitted, and, indeed, are required, to consider the legislative history of a criminal statute particularly if its language is ambiguous and to construe it strictly to prevent the imposition of punishment on the unintended and on the innocent. *E. g., United States v. Campos-Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971).

It is abundantly clear that Congress intended to prohibit the activities of large-scale organized gambling syndicates when it enacted section 1955. Thus the House Report accompanying section 1955, a part of the "Organized Crime Control Act of 1970," contained the following explanation of legislative intent:

> The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with the illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function. H.R. Rep.No.91–1549, 91st Cong. Second Sess. (1970); 2 U.S.Code Cong. and Admin.News 1970 at p. 4029.

The same expression of Congressional intent was stated by Senator Allott, in explaining to his colleagues that section 1955 had been drafted and approved only after extensive investigation of syndicated gambling and related criminal activity:

> To help dry up this source of huge criminal revenues, Title VIII will make it a Federal offense to engage in any large-scale business enterprise of illegal gambling. It does not purport to bring all illegal gambling activity within the control of the Federal Government. It deals only with those who are engaged in an illicit gambling

---

1. The district court expressed its concern about the prosecution of cases like the one before us in these words: "This seems to be something of a local proposition, rather than something which addresses itself to the United States Government. You are sort of making a police court out of this Court by presenting cases of this kind."

business of major proportions, as distinguished from those whose operations are relatively small. 116 Cong. Rec. 603.

 In accordance with its intent to interdict large-scale gambling syndicates, Congress imposed liability not on participants in social or neighborhood gambling activities but on active participants in a "gambling business" but only if the business involves at least five active participants and operates for more than thirty days or has gross receipts of more than $2,000 in a single day. It appears from its use of the term "gambling business" as an element of the offense that Congress intended to assert jurisdiction only over established commercial criminal enterprises in which five or more persons have a financial interest and who are active in its operation. *See, e. g., United States v. Thomas,* 508 F.2d 1200 (8th Cir. 1975) *cert. denied, sub nom. Schullo v. United States,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975). Accordingly, although we agree that the five participants necessary to permit the assertion of federal jurisdiction may include "street-level" employees, such as dealers, in addition to high-level management personnel, *see, e. g., United States v. Mattucci,* 502 F.2d 883 (6th Cir. 1974), *United States v. Jones,* 491 F.2d 1382 (9th Cir. 1974), *United States v. Harris,* 460 F.2d 1041 (5th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972), nevertheless, we observe that there still must be at least five persons who are active in its operation and share an interest in the success of the venture. The critical five persons may work together in different relationships. For example, in *United States v. Hunter,* 478 F.2d 1019 (7th Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973), the court held that three different games of chance, each conducted by different persons, constituted a single enterprise for the purpose of section 1955 because the games were conducted in a common building and because the individuals had common security arrangements and a common interest in the development of sales, the efficient performance of services, and in the solvency of the purportedly separate enterprises.

 Also, we hold that the government must show, in order to prove a violation of the statute, that five persons conducted a gambling business for more than thirty days.[2] *Accord, United States v. Bridges, supra.*[3] In *Bridges,* the court reversed the convictions of five persons who were operating a gambling business because only four of the five had been participants for more than thirty days. We agree with the result reached in *Bridges* both for the reasons stated in this opinion and for the reasons given by the court in *Bridges.*

 In light of these standards, we review the evidence. We determine that there is insufficient evidence to support the conviction of Leslie Cooper, who admittedly was a dealer for Howard Donnelly, and hold that the district court erred in denying his motion for a directed verdict of acquittal. The only evidence from which it might be inferred that Howard Donnelly and Lewis Tarter conducted a single gambling business was that Donnelly vouched for Tarter when Tarter leased the Pastime Cafe, that Donnelly assisted him occasionally

---

**2.** Alternatively, of course, the government may prove that a gambling business conducted by five persons had gross receipts in excess of $2,000 on a single day.

**3.** The government suggests that the decision in *Bridges* is in conflict with this court's decision in *United States v. Mattucci,* 502 F.2d 883 (6th Cir. 1974). In *Mattucci,* however, we were asked to review one sentence of lengthy jury instructions that stated that the government need not prove "each and every defendant participated in the illegal gambling business for a period in excess of thirty days . . .." The quoted passage is a correct statement of the law: an individual who becomes a participant in an illegal gambling business may be convicted of a violation of section 1955 even if he participated for only a few days but if and only if the gambling business has been operated by at least five persons for a substantially continuous period in excess of thirty days. *But see United States v. Smaldone,* 485 F.2d 1333, 1351 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974).

in payment of his rent, and that Donnelly was present at the Pastime Cafe on three occasions. Viewing this evidence in the light most favorable to the prosecution, we hold that it is insufficient to support a finding that the poker game at Howard's Grill and those at the Pastime Cafe were a single gambling business. Accordingly, the conviction of Leslie Cooper, Howard Donnelly's dealer, is reversed.

We affirm the convictions of the other appellants. The record is clear that Lewis Tarter and Douglas Donnelly conducted a gambling business at the Pastime Cafe that was in substantially continuous operation for more than thirty days and involved at least three other regular participants during that period. See United States v. Dimario, 473 F.2d 1046, 1047–48 (6th Cir.), cert. denied, 412 U.S. 907, 93 S.Ct. 2298, 36 L.Ed.2d 972 (1973). Poker games were played at the Pastime two or three times a week. Moreover, the record permits the conclusion that defendants Joseph Putthoff, Thomas Dietz, Charles Livers, and Michael Grout were "regular" dealers at the Pastime Cafe over a period in excess of 30 days, even though they did not work every day during the critical period. And, even though the participation of Sanford Rue in the venture is not as clear, once there are five participants who are regularly engaged in operating a gambling business for a period in excess of thirty days, other participants may be criminally liable even if they did not work in the venture for the entire period of more than thirty days.

Even though we affirm the convictions of Tarter, Grout and Rue, we vacate, as the government concedes we must, the orders of the district court revoking its grant of probation and substituting sentences of imprisonment, and remand the case with instructions to enter an order reinstating the sentences of probation. It appears from the language of the orders challenged and from the different treatment accorded the defendants who elected not to appeal that the sole reason for the district court's actions was appellants' decision to appeal. "A court is 'without right to * * * put a price on an appeal. A defendant's exercise of a right of appeal must be free and unfettered. * * * [I]t is unfair to use the great power given to the court to determine sentence to place a defendant in the dilemma of making an unfree choice.'" North Carolina v. Pearce, 395 U.S. 711, 724, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

The conviction of Leslie Cooper is reversed, and the convictions of the other appellants are affirmed, but their cases are remanded for reinstitution of the probationary sentences consistent with this opinion.

Reversed in part, affirmed in part, and remanded with instructions.