**UNITED STATES of America,**

v.

**William P. RIEGER, Appellant.**

No. 90–3615.

United States Court of Appeals, Third Circuit.

Submitted June 14, 1991.

Decided Aug. 22, 1991.

---

William P. Rieger, pro se.

Thomas W. Corbett, Jr., U.S. Atty., Paul J. Brysh, Asst. U.S. Atty., Bonnie R.

Schlueter, Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before BECKER and ALITO, Circuit Judges, and HUYETT, District Judge.*

## OPINION OF THE COURT

HUYETT, District Judge.

William Rieger was convicted of one count of conducting a gambling business involving five or more persons in violation of the Organized Crime Control Act of 1970, 18 U.S.C. § 1955, after a jury trial in the Western District of Pennsylvania. Rieger now appeals, challenging the sufficiency of the evidence. He also contends that he was denied effective assistance of counsel.[1] We affirm his conviction.

### I.

This case arose from an investigation of illegal gambling in Erie, Pennsylvania, during the winter and spring of 1989. During that time, Officer Michael A. Russo, of the Pennsylvania State Police, conducted an undercover gambling investigation at Dominick's Restaurant.

On January 19, 1989, Officer Russo attempted to enter the gambling operation on the second floor of Dominick's Restaurant. He was stopped, however, by Lou Dougherty and told to wait in the restaurant on the first floor. Some twenty minutes later, Rieger approached the officer, and, in an effort to prevent police officers from infiltrating his poker game, questioned Officer Russo on his background and poker playing experience. Rieger permitted Officer Russo to observe the poker game that night, in preparation for his eventual participation. Officer Russo was led by Rieger to the second floor through three locked doors. At the first door, they rang a buzzer and the door was opened by Paul Nuara. After climbing halfway up a staircase, they approached a second door on a stairwell.

---

* Hon. Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. In addition, Rieger contends that the district court erred in failing to dismiss the indictment against him because it did not state the title of the law of the Commonwealth of Pennsylvania that he, as opposed to his gambling business, violated. We find this argument to be meritless.

A surveillance camera was mounted in the corner of the stairwell. They rang another buzzer and the door was opened. After passing through the second door, they continued to climb the stairs until reaching a third door, which was watched by an individual named John. On the second floor of Dominick's Restaurant, Officer Russo observed approximately ten persons playing poker. During the game, Sam "Blacky" Sunseri, Lou Dougherty, Rieger, and Bill Anderson served as the "cut men." A "cut man" is designated to retrieve an amount of money from the bets placed during each hand of poker, the "pot." This amount, usually referred to as the "rake," varies depending on the amount of the ante set for the hand of poker. The game was fast paced; twenty to twenty-five hands were played each hour and the pot averaged $300.00 for each hand. Sam "Blacky" Sunseri and Paul Nuara served cigarettes and beverages. Officer Russo left the game at 4:40 a.m., at which time about fifteen players were still playing poker.

Officer Russo returned to the poker game at Dominick's Restaurant and played poker on February 2, 1989, February 16, 1989, March 9, 1989, and June 8, 1989. During these visits, several of the same people that Officer Russo recognized from his visit of January 19, 1989 acted as doormen and "cut men." In addition, John Orth played poker at Rieger's game three nights a week from June 1988 to June 1989, and Chuck Serafino and Orth served as "cut men."

Rieger admitted that he had been operating the game for two years, that he earned between $200 to $300 a night on the game, and that Lou Dougherty worked for him.

F.B.I. Agent Louis J. Caprino testified as an expert on gambling. Agent Caprino explained that in a gambling operation, the "rake" is the method used to make a profit. In games not part of an illegal gambling business, the "rake" is applied to defray expenses (refreshments, decks of cards, and the like) with the remaining amount of money, if any, distributed evenly among the players. However, the evidence is clear that Rieger did not redistribute money taken from the pot to any of the players, but retained the "rake" as profit.

## II.

■ After the jury returned a verdict of guilty, Rieger moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on the basis that the government failed to establish a *prima facie* case. In reviewing the denial of a motion for judgment of acquittal based on insufficiency of the evidence, we "must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978) (citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)); *Government of the Virgin Islands v. Ramos*, 730 F.2d 96, 98 (3d Cir.1984). Our scope of review is plenary. *United States v. Phillips*, 874 F.2d 123 (3d Cir.1989). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## III.

Rieger contends that the district court erred in denying his motion for judgment of acquittal because, *inter alia*, the government failed to establish that five or more persons were involved in the operation of a gambling business at all times during a period of more than thirty days, and that those who were involved in its operation had a financial interest in the gambling business.[2] In contrast, the government contends that section 1955, 18 U.S.C. § 1955, requires neither proof of a continuous involvement of five persons in the gambling business for more than thirty days, nor proof that those involved had a financial interest in the gambling business.

---

2. Also, Rieger contends the government failed to establish under section 1955(b)(1)(i) that he, as opposed to his gambling business, violated the law of the Commonwealth of Pennsylvania. However, "it is only the gambling business that must violate state law." *Sanabria v. United States*, 437 U.S. 54, 70, 98 S.Ct. 2170, 2182, 57 L.Ed.2d 43 (1978). We find Rieger's argument to be meritless.

The outcome of this appeal turns on our interpretation of the language of section 1955. Section 1955(a) makes it a federal offense to operate a gambling business that is illegal under state or local law. Section 1955(b)(1) sets forth which gambling businesses fall within the federal prohibition:

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

■ The evidence clearly establishes that Rieger's poker game at Dominick's Restaurant was in substantially continuous operation for a period in excess of thirty days. Officer Russo's visits spanned a period of almost six months. During each visit, poker was played. Moreover, Rieger admitted that he had been operating the poker game for two years. In addition, John Orth had played poker at Rieger's game from June 1988 through June 1989.

■ Similarly, the evidence makes clear that on January 19, 1989 more than five persons were involved in the conduct of the poker game at Dominick's Restaurant. First, Lou Dougherty denied Officer Russo entry to the second floor game and instructed him to wait in the restaurant. Also, that same evening Lou Dougherty took a turn as a "cut man." Second, Rieger himself screened Officer Russo and filled him in on the details of the game, and later served as a "cut man." Not only did Rieger manage the game, but also he admitted to having a financial interest in the game. Third and fourth, Paul Nuara and an individual named John acted as doormen to the doors leading up to the second floor. Fifth and sixth, Sam "Blacky" Sunseri and Bill Anderson each served as a "cut man."

In sum, these six persons performed duties in furtherance of the illegal gambling business on January 19, 1989, and Rieger does not dispute this evidence.

The evidence further shows that, on four subsequent dates, three or four of these individuals were involved in the conduct of the poker game at the restaurant. Officer Russo testified that, when he returned to play poker at Dominick's on February 2, 1989, Nuara and Sunseri served as doormen, Dougherty served as cut man, and Rieger was present to manage the game. When Russo returned to play poker on February 16, 1989, Nuara and Sunseri again served as doormen and Rieger acted as the cut man. According to Russo, Rieger and Dougherty both served as cut men for the game on March 9, 1989 and June 8, 1989. On March 9th, Nuara acted as doorman, and John Orth filled that role on June 8th. Neither Rieger nor the government disputes this evidence.

■ Rieger does contend that, in order to be counted as one of the five or more persons involved in a gambling business under section 1955(b)(1)(ii), a participant must have a financial interest in the gambling business. However, the language of subsection (b)(1)(ii) of section 1955 does not require that each of the five or more persons involved has a financial interest in the gambling business.

In *United States v. Riehl*, 460 F.2d 454 (3d Cir.1972), we declined to read section 1955 as unconstitutionally vague and discussed the reach of section 1955's proscribed conduct under subsection (b)(1)(ii). In *Riehl*, we noted that, although the word "conduct" as it appears in subsection (b)(1)(ii) was not defined, its breadth was clarified by resort to its legislative history. Senate Bill 30, the original legislation which later became subsection (b)(1)(iii), defined an "illegal gambling business" as one which "involves five or more persons who participate in the gambling activity." This definition was later narrowed by the House Amendment to exclude bettors from the five-person requirement. This amendment dropped the word "participate" and substituted "conduct, finance, manage, supervise,

direct, or own." The House Judiciary Committee Report explains as follows:

> The term 'conducts' refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gamblig activity by placing a bet.

House Report at 53, 2 U.S.Code Cong. & Admin.News 1970 at p. 4029, *quoted in Riehl,* 460 F.2d at 459. Finally, in *Riehl* we concluded that, while bettors are excluded from the five-person count, all other participants are included. *Id.* at 459.

Consistent with this view, in *United States v. Ceraso,* 467 F.2d 653, 656 (3d Cir.1972), we noted that the term "conduct" as it appears in subsection (b)(1)(ii) was intended to mean "any participation in the operation of the gambling business." Moreover, the Supreme Court in *Sanabria v. United States,* 437 U.S. 54, 70–71 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978), made clear that section 1955 "proscribes any degree of participating in an illegal gambling business, except participation as a mere bettor." *See also United States v. Zannino,* 895 F.2d 1, 10 (1st Cir.), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990) ("As we read it, the statute of conviction applies even to individuals who have no role in managing or controlling the business and who do not share in its profits. . . . In sum, section 1955 proscribes any type or degree of participation, except participation as a mere bettor."); *United States v. Merrell,* 701 F.2d 53, 54 (6th Cir.), *cert. denied,* 463 U.S. 1230, 103 S.Ct. 3558, 77 L.Ed.2d 1415 (1983) ("The courts of appeals have also recognized that only customers are outside the purview of the statute.").

 Applying this standard to the five persons involved, other than Rieger,[3] in the operation of the gambling business on January 19, 1989, we need consider only whether the duties of a doorman and "cut man" fall within the meaning of the word "conduct." Viewing the evidence in a light most favorable to the government, we conclude that those who acted as doormen or "cut men" were not mere bettors, but were participants within the purview of subsection (b)(1)(ii). This status as a "participant" is not diminished by placing a bet during a poker game. *See United States v. Colacurcio,* 659 F.2d 684, 688 (5th Cir.) *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982). Including Rieger, the conduct of all six of the individuals who participated in the gambling business on January 19, 1989 satisfies the strictures of subsection (b)(1)(ii).

 Rieger further contends that the definition of an "illegal gambling business" under section 1955(b)(1) requires that five persons must be involved at all times throughout a single period of more than thirty days. This interpretation is not without support. The Fifth and Sixth Circuits have considered the issue and concluded that the definition of "illegal gambling business" under section 1955 is ambiguous. *United States v. Tarter,* 522 F.2d 520, 525 (6th Cir.1975); *United States v. Bridges,* 493 F.2d 918, 920 (5th Cir.1974). This conclusion triggered a review of the legislative history behind section 1955. Similarly, the Fourth Circuit, without explicitly finding section 1955 to be ambiguous, reviewed the legislative history behind section 1955. *United States v. Gresko,* 632 F.2d 1128, 1133 (4th Cir.1980). Based on their reading of the legislative history, these circuits interpreted subsections (b)(1)(ii) and (1)(iii) as proscribing a gambling business involving five or more persons at all times during a period in excess of thirty days. However, we do not find it necessary to look beyond the statutory language which we find to be unambiguous.[4]

---

3. From the evidence established at trial, it is clear that on all occasions Rieger financed, managed, supervised, and directed the game in violation of section 1955(b)(1)(ii).

4. The Fourth, Fifth, and Sixth Circuit cases relied primarily upon a passage in the House report. *See Gresko,* 632 F.2d at 1132; *Tarter,*

522 F.2d at 525; *Bridges,* 493 F.2d at 921–22. This passage states (H.Rep. No. 1549, 91st Cong., 2d Sess. *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4029):

> The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the federal

As we have previously emphasized, "[i]n determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *United States v. Kennings*, 861 F.2d 381, 387 (3d Cir. 1988) (quoting *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983)). *See also Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) ("When we find the terms of a statute unambiguous, judicial inquiry is complete," except for extraordinary circumstances.); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 808 n. 3, 109 S.Ct. 1500, 1504, 103 L.Ed.2d 891 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.").

On its face, the relationship between subsections (b)(1)(ii) and (b)(1)(iii) of section 1955 is unambiguous. The statute presents two separate and independent jurisdictional requirements for an illegal gambling business. These two requirements are stated distinctly and separated by the word "and." Rieger contends that the use of the word "and" requires that subsections (b)(1)(ii) and (b)(1)(iii) be read as one. Thus, Rieger maintains that the requirement of five or more participants must be satisfied at all times during a period in excess of thirty days. We decline to agree with this interpretation.

Instead, we think that the interpretation of section 1955 expressed by the Tenth Circuit in *United States v. Smaldone*, 485 F.2d 1333, 1351 (10th Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974), is persuasive. There, the court interpreted the five-person requirement under subsection (b)(1)(iii) as standing independent of the thirty-day requirement under subsection (b)(1)(iii). Each of the requirements under subsection (b)(1)(ii) and (b)(1)(iii) were applied separately to the illegal gambling business. In rejecting the interpretation urged on us by Rieger, the court in *Smaldone* stated:

> It is not essential, contrary to appellants' assertions, to establish that each conductor was involved in the gambling business for more than thirty days or generated at least $2000 gross revenue in a single day. These requirements refer to the gambling operation and not to individuals.

*Id.* at 1351.

Under the facts before us, the gambling business was in substantially continuous operation for more than thirty days, five or more participants were involved in the gambling business on January 19, 1989, and as noted above, *see supra* at page 233, a number of the participants were also involved on other dates throughout the relevant period. In light of our interpretation of section 1955(b)(1), we affirm the district court's decision to deny Rieger's motion for acquittal.

■ Next, Rieger contends that he was deprived of effective assistance of counsel. Generally, it is our practice not to entertain ineffective assistance of counsel claims on direct appeal. *See United States v. Sandini*, 888 F.2d 300, 311–312 (3d Cir.1989),

---

Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function.

Even if we were not persuaded by the plain meaning of the statutory language, we would not find the above-quoted language dispositive with respect to the issue before us. This passage and similar statements in the legislative history show that Congress enacted 18 U.S.C. § 1955 in order to prohibit large-scale illegal gambling operations. However, as has been discussed, we think that Congress, in the language of § 1955, clearly defined the threshold contours of the type of gambling operations that it sought to interdict. We therefore think that our holding, concerning a gambling operation that comports with those threshold contours, is consistent with Congress's general purpose in enacting this statute.

*cert. denied,* —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990); *United States v. Gambino,* 788 F.2d 938 (3d Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). Based on the facts before us, there is no reason to deviate from this practice. If the defendant wishes to pursue this issue, he must raise it in a proceeding under 28 U.S.C. § 2255.

## IV.

The conviction of William Rieger for violating 18 U.S.C. § 1955 will be affirmed.