

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-1998

# Arroyo-Angulo v. United States

Precedential or Non-Precedential:

Docket 97-5407,97-5409,97-5473

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Arroyo-Angulo v. United States" (1998). *1998 Decisions.* Paper 115.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/115

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5409

UNITED STATES OF AMERICA

v.

BARDUL TAFTSIOU,
        Appellant

No. 97-5473

UNITED STATES OF AMERICA

v.

JAMES TAFTSIOU,

aka James Taft, aka Gezim Taftsiou

James Taftsiou,
        Appellant

On Appeal from the United States District Court
for the District of New Jersey

(D.C. Crim. Nos. 95-cr-00681-1, 95-cr-00681-6)

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 18, 1998

Before: SLOVITER and GREENBERG, Circuit Judges ,
and POLLAK, District Judge*
_____

* Hon. Louis H. Pollak, United States District Court for the Eastern
District of Pennsylvania, sitting by designation.

        Jerome A. Ballarotto
        Mel Sachs
        Charles O. Lederman
        Trenton, N.J. 08610

         Attorneys for Appellants

        Faith S. Hochberg
         United States Attorney
        Kevin McNulty
        George S. Leone
        Office of United States Attorney
        Newark, N.J. 08101

         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Bardul Taftsiou was convicted in the United States District Court for the District of New Jersey of possessing, delivering, passing and conspiring to pass approximately $1 million in counterfeit Federal Reserve Notes. At the same trial, his son James Taftsiou was convicted of dealing and conspiring to pass approximately $1 million in counterfeit Federal Reserve Notes. On appeal, both defendants challenge their convictions and sentences, raising the same issues. For the reasons that follow, we will affirm.

I.

In late 1994, Bardul Taftsiou and his brother Kadri discussed with Mostafa Mahamoud the possibility of obtaining counterfeit United States currency, but ultimately Bardul decided to print his own counterfeit notes with the help of his 33-year old son James. In March and April of 1995, James Taftsiou, using a false identity, purchased an extremely high capability computer for $7,300, a top-of-the-line color printer for $8,000-9,000 and a very large,

accurate commercial paper cutter. With this equipment, father and son began printing double-sided full-color counterfeit $100 notes. Several months later, they also began printing counterfeit $50 notes. Both denominations of counterfeit bills were printed with magnetic ink so that they would be accepted by slot machine bill validators in Atlantic City, New Jersey and Las Vegas, Nevada.[1]

After the printing operations were underway, Bardul gave Mahamoud a bag of counterfeit notes and suggested that he recruit a group of people to go to Atlantic City over Memorial Day weekend to use the notes in casino slot machines. Once in Atlantic City, Mahamoud and the others would insert the notes in various slot machines, play the machine for a short period of time or not at all, hit the "cash out" button and exchange the tokens paid out by the machine for genuine currency. Mahamoud would then bring the genuine currency to Bardul and Kadri Taftsiou in exchange for more counterfeit notes.

On May 28, 1995, during the Memorial Day weekend trip, one of the men in Mahamoud's group successfully passed three of the counterfeit $100 bills to a prostitute, who informed the police when she realized the bills were counterfeit. Thereafter, both genuine and counterfeit notes were found in Mahamoud's room and on his person, some of which matched the bills given to the prostitute.

An additional $55,000 of the Taftsious' counterfeit notes was passed in slot machines in various Atlantic City casinos over the Memorial Day weekend. Secret Service agents testified that they could trace the notes to the Taftsiou group because they had never before encountered notes exactly like those recovered from Mahamoud and the others during the Memorial Day weekend. The notes exhibited several distinct patterns that did not appear

_____

1. Bill validators allow a casino's customers to play slot machines using paper currency. Once a customer inserts a bill into the validator, the validator scans the bill for the presence of magnetic ink as used in genuine United States currency. If the bill is accepted, the customer can either play the machine or "cash out" and receive casino tokens redeemable for cash.

anywhere in the Secret Service's nationwide database of recovered counterfeit currency.

In the summer of 1995, James Taftsiou began passing the counterfeit notes in Las Vegas. On the July 4th weekend, James and his friend Bujar Musa were captured on casino surveillance videotapes passing the counterfeit notes in various slot machines. By July 13, 1995, the Secret Service in Las Vegas had received $79,000 of the Taftsious' counterfeit notes.

From June 1 through November 17, 1995, Secret Service agents apprehended fourteen individuals for passing the Taftsious' counterfeit currency in both Atlantic City and Las Vegas and collected over $325,000 of the Taftsious' notes. Those arrested included relatives, friends, friends of relatives and individuals randomly recruited by James Taftsiou to pass the counterfeit notes in the casinos.

Mahamoud began cooperating with the investigating authorities in October of 1995. Bardul and some of his family members were arrested in November 1995 at Tropworld Casino in Atlantic City where they passed counterfeit bills into slot machines while Bardul collected the casino tokens from them and exchanged them for genuine currency. The agents recovered $9,000 in both counterfeit and genuine currency from the arrestees, their car, and the slot machines they had been playing. James Taftsiou was subsequently arrested on February 6, 1996.

Count One of the five-count superseding indictment charged Bardul, James, Nazmije Taftsiou (Bardul's wife), Julie Hasimi (Bardul's daughter) and Ilim Asimi (Julie Hasimi's brother-in-law) with conspiring with each other and seventeen other named co-conspirators plus others known and unknown to buy, sell, exchange, transfer, deliver, pass, utter conceal and keep in their possession approximately $1 million in counterfeit $100 and $50 Federal Reserve Notes in violation of 18 U.S.C. SS 371, 472 and 473.2 Bardul and Nazmije Taftsiou, Julie Hasimi and Ilim Asimi were charged in Count Two with passing

_____

2. Arzija Taftsiou, Bardul's mother, was indicted with the others, but the charges against her were dismissed.

approximately 17 counterfeit $50 notes with intent to defraud in violation of 18 U.S.C. SS 472 and 2, and in Count Three with possessing and concealing approximately 90 counterfeit $50 notes in violation of 18 U.S.C. SS 472 and 2. Count Four charged James Taftsiou with dealing in approximately 60 counterfeited $50 notes in violation of 18 U.S.C. SS 473 and 2. Count Five charged Bardul Taftsiou with dealing in approximately 17 counterfeit $50 notes, also in violation of 18 U.S.C. SS 473 and 2. Approximately twenty other individuals were charged for related offenses in separate indictments.

Following a seven-week trial, Bardul and James Taftsiou were found guilty on all counts with which they had been charged. Nazmije Taftsiou and Julie Hasimi were acquitted. Bardul was then sentenced to four 51-month terms of imprisonment to be served concurrently, and James was sentenced to two concurrent 54-month terms. Both were ordered to pay $25,000 in restitution, but were given no fine. These consolidated appeals followed.

II.

A.

Appellants argue first that the district court erred in denying their motion for acquittal which they filed at the close of the government's case-in-chief. Defendants do not contest the relevant facts but argue that there was insufficient evidence to support a finding that they intended to pass the counterfeit notes to any person or that the notes appeared sufficiently genuine to be considered "counterfeit" within the meaning of 18 U.S.C. SS 472 and 473. At the end of the trial, the district court denied the motion, finding that the "bills were two-sided. They were both $100's and $50's. They bore a close resemblance in terms of the images on both sides to a genuine bill, and they also bore a close resemblance to the color and colors found both on the backs and the fronts of genuine bills." App. at 143.

Our review is plenary and, in exercising that review, we must interpret the evidence in the light most favorable to

5

the government as the verdict winner. See United States v. Rieger, 942 F.2d 230, 232 (3d Cir. 1991).

Section 472 of Title 18 of the United States Code provides, in relevant part, that "[w]hoever, with intent to defraud, passes . . . or keeps in possession or conceals any . . . counterfeited . . . obligation . . . of the United States, shall be fined under this title or imprisoned not more than fifteen years, or both." 18 U.S.C. S 472. Section 473 provides in relevant part that "[w]hoever buys, sells, exchanges . . . any . . . counterfeited . . . obligation . . . of the United States, with the intent that the same be passed . . . as true and genuine, shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. S 473. Neither statute on its face requires that a defendant have intended to pass the counterfeit notes to a person or that the notes closely resemble genuine currency.

Over fifty years ago, however, this court held in United States v. Lustig, 159 F.2d 798 (3d Cir. 1947), rev'd in part on other grounds, 338 U.S. 74 (1949), that

> the proper test to be applied is whether the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest.

Id. at 802.

Only those counterfeit notes that are sufficiently similar to genuine currency so as to meet this definition may be considered "counterfeit." Id. Since we issued Lustig, our reasoning and the language we employed there have been adopted by virtually every court that has addressed the issue. See, e.g., United States v. Gomes, 969 F.2d 1290 (1st Cir. 1992); United States v. Ross, 844 F.2d 187 (4th Cir. 1988); United States v. Cantwell, 806 F.2d 1463 (10th Cir. 1986); United States v. Johnson, 434 F.2d 827 (9th Cir. 1970).

Defendants argue that because the paper notes they circulated were not of high enough quality to pass hand-to-

6

hand, they could not be characterized as "counterfeit." They rely almost exclusively on the opinion of the United States Court of Appeals for the Fourth Circuit in Ross, 844 F.2d 187, where the $1 bill defendants were charged with counterfeiting was a one-sided photocopied black and white reproduction on plain white paper. The defendants had attempted to insert the photocopy into a change machine at a car wash. Their convictions under 18 U.S.C. SS 471 and 472 were reversed on the ground that the reproduction was not sufficiently similar to genuine notes. According to the court, the photocopies were "patently fake,""obviously false and bogus," and could not be mistaken for genuine from "one hundred feet away." Id. at 189-90. In addition, the court pointed out that there had been no testimony that the reproduction had actually deceived anyone. Id. at 190.

The evidence in this case differs from that in Ross. Bardul's daughter Julie Hasimi testified that she believed the counterfeit notes were genuine, and there was evidence in the record that three of the bills had been successfully passed to at least one person. Supp. App. at 86. A Secret Service expert in the analysis of counterfeit currency testified that the Taftsious' bills were "average" and that she was aware of worse quality bills having been successfully passed in other cases. Supp. App. at 246A.

In addition to the testimony adduced at trial, physical examples of the Taftsious' counterfeit notes were admitted into evidence. See Addendum to Appellee's Br.; Gov't. Exh. 183, 220. Therefore, presumably each juror could touch and examine the notes and come to his or her own conclusion regarding the reasonableness of their being accepted by an honest, unsuspecting person. Thus, it was not improper for the district court to have described the bills on the record and to have commented that "the evidence speaks for itself." App. at 143. In doing so, the judge did not, as appellants claim, improperly weigh the evidence. The judge merely acknowledged that the jurors were entitled to examine and consider the Taftsious' notes in reaching their conclusion, based on the totality of the evidence, that the bills were sufficiently similar to genuine currency to be "counterfeit" within the meaning of 18 U.S.C. SS 472 and 473.

7

Finally, we reject appellants' suggestion that the counterfeiting statutes at issue require them to have passed or intended to pass their notes to persons, as opposed to machines. Our decision in Lustig with its emphasis on whether the bills could deceive "an honest, sensible and unsuspecting person" was written in a time when machines were not regularly used to process money. There seems little reason why false bills that are successfully processed through machines, whether slot machines, vending machines or others, should not be treated the same for purposes of the counterfeiting statutes as false bills that were passed to a person. The intent to defraud is the same, as is the effect. The statutes themselves do not contain language requiring passing to a person. A slight clarification by Congress to expressly require treatment of counterfeit bills passed through machines equal to that of counterfeit bills passed to persons would eliminate any question of a different interpretation. However, we need not resolve this issue because the record before us is adequate for us to affirm the district court's denial of appellants' Rule 29 motion for judgment of acquittal even under the Lustig standard.

B.

Defendants next argue that the district court erred in refusing to charge a misdemeanor violation of 18 U.S.C. S 491 as a lesser included offense of the counterfeiting charges. Following some period of uncertainty as to the interpretation of Rule 31(c) of the Federal Rules of Criminal Procedure with respect to when a jury may convict a defendant "of an offense necessarily included in the offense charged," there are now some clear guidelines. A district court is required to charge an offense as a lesser included of a greater offense when requested if "the elements of the lesser offense are a subset of the elements of the greater offense." United States v. Mosley, 126 F.3d 200, 203 (3d Cir. 1997). On the other hand, "[w]here the lesser offense requires an element not required for the greater offense, no instruction is to be given under Rule 31(c)." Schmuck v. United States, 489 U.S. 705, 716 (1989). "This standard involves a textual comparison, looking solely to the

8

elements of the two offenses; inferences arising from the evidence and similarities as to the interests served by the statutes are not relevant." Mosley, 126 F.3d at 203-04 (citing Schmuck, 489 U.S. at 720).

In the case at bar, a most cursory review of the relevant statutory language reveals that the lesser offense of S 491 requires elements not required by SS 472 and 473.3 Namely,

_____

3. The full text of S 472 is as follows:

      Whoever, with intent to defraud, passes, utters, publishes, or sells,
      or attempts to pass, utter, publish, or sell, or with like intent brings
      into the United States or keeps in possession or conceals any falsely
      made, forged, counterfeited, or altered obligation or other security of
      the United States, shall be fined under this title or imprisoned not
      more than fifteen years, or both.

18 U.S.C. S 472.

Section 473 provides in full:

      Whoever buys, sells, exchanges, transfers, receives, or delivers any
      false, forged, counterfeited, or altered obligation or other security of
      the United States, with the intent that the same be passed,
      published, or used as true and genuine, shall befined under this
      title or imprisoned not more than ten years, or both.

18 U.S.C. S 473.

The relevant subsections of the misdemeanor statute that the appellants contend the district court should have charged as a lesser included offense are as follows:

      (a) Whoever, being 18 years of age or over, not la wfully
      authorized, makes, issues, or passes any coin, card, token, or device
      in metal, or its compounds, intended to be used as money, or
      whoever, being 18 years of age or over, with intent to defraud,
      makes, utters, inserts, or uses any card, token, slug, disk, device,
      paper, or other thing similar in size and shape to any of the lawful
      coins or other currency of the United States or any coin or other

currency not legal tender in the United States, to procure anything of value, or the use or enjoyment of any property or service from any automatic merchandise vending machine, postage-stamp machine, turnstile, fare box, coinbox telephone, parking meter or other lawful receptacle, depository, or contrivance designed to receive or to be operated by lawful coins or other currency of the United States, shall be fined under this title, or imprisoned not more than one year, or both.

9

S 491 requires that a fraudulent card, slug or paper be used or intended to be used in a vending machine, stamp machine, turnstile, fare box, or other "contrivance designed to receive or to be operated by lawful coins or other currency of the United States." 18 U.S.C. S 491. Sections 472 and 473 have no such requirement.

Thus, if one were to pass counterfeit notes to a human being, the perpetrator could be convicted underS 472, but would not be guilty of having violated S 491. Likewise, one who buys or sells counterfeit notes could be convicted under S 472, but would not necessarily be guilty of having violated S 491. The mere coincidence that, in this case, defendants' conduct may have simultaneously violated SS 472, 473, and 491 does not affect the Rule 31(c) analysis. See Schmuck, 489 U.S. at 716–17 (the "comparison is appropriately conducted by reference to the statutory elements of the offenses in question, and not . . . by reference to conduct proved at trial. . . .")."[L]ooking solely to the elements of the two offenses," Mosley, 126 F.3d

_____

       (b) Whoever manufactures, sells, offers, or advert ises for sale, or
       exposes or keeps with intent to furnish or sell any token, slug, disk,
       device, paper, or other thing similar in size and shape to any of the
       lawful coins or other currency of the United States, or any token,
       disk, paper, or other device issued or authorized in connection with
       rationing or food and fiber distribution by any agency of the United
       States, with knowledge or reason to believe that such tokens, slugs,
       disks, devices, papers, or other things are intended to be used
       unlawfully or fraudulently to procure anything of value, or the use
       or enjoyment of any property or service from any automatic
       merchandise vending machine, postage-stamp machine, turnstile,
       fare box, coin-box telephone, parking meter, or other lawful
       receptacle, depository, or contrivance designed to receive or to be
       operated by lawful coins or other currency of the United States shall
       be fined under this title or imprisoned not more than one year, or
       both.

       Nothing contained in this section shall create immunity from
       criminal prosecution under the laws of any State, Commonwealth of
       Puerto Rico, territory, possession, or the District of Columbia.

18 U.S.C. S 491.

at 203, S 491 is not a lesser included offense of SS 472 and 473.

Accordingly, we will affirm the district court's denial of the Taftsious' Rule 31(c) motion to charge 18 U.S.C.S 491 as a lesser included offense of the counterfeiting violations of which they were convicted.

C.

Finally, the Taftsious challenge their sentences on two different grounds. First, they argue that the district court erred in enhancing their sentences by 11 levels pursuant to U.S.S.G. SS 2B5.1(b)(1) on the ground that the "amount of loss" was allegedly unsubstantiated by the evidence. Second, they contend that the 11-level enhancement was improper in light of the poor quality of the notes.

Under the United States Sentencing Guidelines, a violation of 18 U.S.C. SS 472 and 473 carries with it a base offense level of 9. U.S.S.G. S 2B5.1(a). "If the face value of the counterfeit items exceeded $2,000," the court should increase the offense level using the table in S 2F1.1. U.S.S.G. S 2B5.1(b)(1). That table provides for an increase of 11 levels where the value of the counterfeit items is between $800,000 and $1.5 million. U.S.S.G. S 2F1.1(b)(1)(L).

In this case, the Probation Office quantified the face value of the counterfeit notes attributable to these defendants at $1.2 million. At sentencing, the district court found by a preponderance of the evidence that the amount in issue for purposes of S 2F1.1 was between $800,000 and $1.5 million. Accordingly, following SS 2B5.1 and 2F1.1, the court increased the Taftsious' offense level by 11 levels.

We review the district court's factual findings for clear error and may reverse those findings only where they are "completely devoid of a credible evidentiary basis or bear[ ] no rational relationship to the supporting data." United States v. Haut, 107 F.3d 213, 218 (3d Cir. 1997) (quoting American Home Prod. Corp. v. Barr Labs., Inc., 834 F.2d 368, 370-71 (3d Cir. 1987)).

11

At trial, Secret Service Agent Brian Donovan testified that approximately $210,000 in counterfeit notes was recovered directly from the defendants and their co-conspirators and in casino machines which they were playing when found. Lorelei Pagano, a Secret Service Agent expert in the analysis of counterfeit currency, testified that virtually all of the $1.2 million in counterfeit notes, including the $210,000 identified by Agent Donovan, had a "common origin" and were made from a "common source." Supp. App. at 234. Susan Fortunato, another agent expert in the analysis of counterfeit currency, testified that all of the notes comprising the approximately $1.2 million in the possession of the Secret Service had been printed using the same brand of computer equipment purchased by James Taftsiou.

In an attempt to counter this evidence, appellants challenge Agent Pagano's analysis on the ground that she actually examined only a handful of the notes at issue. However, Agent Pagano testified in detail regarding the analysis she employed in identifying the $1.2 million in counterfeit notes as being of common origin. Her testimony was sufficient to support a finding that all $1.2 million originated from a common source. In turn, other evidence in the record, including the testimony of Agents Fortunato and Donovan as well as that of James Taftsiou and several of his co-conspirators, was sufficient to support a finding that the source was the Taftsious.

Moreover, appellants' general assertion that "only a fraction of the $1.2 million charged was directly linked to this case and any related cases" does not demonstrate clear error. Given the district court's finding that the face value of the notes at issue was between $800,000 and $1.5 million, the Taftsious would have to show that Agent Pagano's calculations were off by more than $400,000-- something they have not attempted to do -- before they could succeed in proving reversible error. See U.S.S.G. S 2F1.1, Appl. Note 8 ("For the purpose of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.").

12

Defendants next challenge the $1.2 million lossfigure on the ground that "this is the age of technology" and argue they should not "be held accountable for such an amalgam of printed material while the various components are certainly available to millions of people within the ether of the Internet." Appellants' Br. at 27–28. They cite nothing in the record to suggest that copies of their counterfeit bills were available on the Internet or that any of the notes at issue were in fact obtained by anyone from that source. Such wild speculation is inadequate to demonstrate clear error on the part of the district court.

The Taftsious seek some assistance from application note 4 to U.S.S.G. S 2B5.1 which provides, in full, that "[s]ubsection (b)(2) [of S 2B5.1] does not apply to persons who merely photocopy notes or otherwise produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." They contend that theirs are examples of the "so obviously counterfeit" notes to which the application note is addressed. However, note 4 is limited by its terms to enhancements under subsection (b)(2) of S 2B5.1 while the district court in the case at bar proceeded under subsection (b)(1). Nonetheless, appellants argue that the "same sort of limiting analysis should have been applied to the enhancement under S 2B5.1(b)(1)." Appellants' Br. at 29.

The Sentencing Commission has expressly and unambiguously limited the reach of note 4 to subsection (b)(2), and we are not at liberty to extend its application to other subsections by judicial fiat alone. Accordingly, we find no error in the district court's finding that the face value of the Taftsious' counterfeit currency was between $800,000 and $1.5 million and that appellants' offense level should be increased by 11 levels pursuant to U.S.S.G. SS 2B5.1(b)(1) and 2F1.1(b)(1)(L).

III.

For the reasons stated above, we will affirm the judgments of conviction and sentence entered by the district court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

14